UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

In re:                                                              Chapter 11

Buckskin Realty Inc.,                                              Case No. 1-13-40083-nhl

                Debtor.
----------------------------------------------------------X

Buckskin Realty Inc.,

                Plaintiff,

v.

Windmont Homeowners Association, Inc.,                             Adv. Pro. No.: 15-01004-nhl
Eva Halpern, an individual,
Allyson Phillips, an individual,
Edward I. Kaplan, an individual,
Young & Sommer, P.C., Cathy Hennessy,

                Defendants.
----------------------------------------------------------X

## DECISION AFTER TRIAL

APPEARANCES:

Wayne M. Greenwald, Esq.                    Barry G. Margolis, Esq.
Jacobs P.C.                                 Abrams Garfinkel Margolis Bergson LLP
717 Fifth Avenue                            1430 Broadway, 17th floor
26th Floor                                  New York, NY 10018
New York, NY 10022                          Attorney for Defendant
Attorney for Plaintiff                      Windmont Homeowners Association, Inc.
Buckskin Realty Inc.

NANCY HERSHEY LORD
United States Bankruptcy Judge

Plaintiff Buckskin Realty Inc. ("Buckskin" or the "Plaintiff"), as chapter 11 debtor-in-possession, commenced this adversary proceeding seeking, among other things, to vacate a state court judgment of foreclosure and sale of two unimproved lots located in Greene County, New York, and to avoid the transfer of those lots for the benefit of Buckskin's bankruptcy estate.  This Court, by decision dated September 23, 2016, dismissed all of Buckskin's claims, except for the claim under 11 U.S.C. § 547[1] against defendant Windmont Homeowners Association, Inc. (the "WHA").  This Court, by decision dated March 26, 2021, further concluded that Buckskin's claim under § 547 against the WHA cannot be determined as a matter of law, and that an evidentiary hearing was necessary to determine whether the WHA received more than it would in a hypothetical chapter 7 case.

For the following reasons, the Court concludes that Buckskin has not established that the WHA received more than it would in a hypothetical chapter 7 case and, therefore, cannot avoid the transfer under § 547(b).

JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(f). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

---

[1] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11, U.S.C.

<u>BACKGROUND</u>

Unless otherwise noted, the following facts are undisputed or are matters upon which judicial notice may be taken.

Buckskin is a for-profit corporation and the successor of the sponsor of Windmont, a private, gated community located in Windham, New York.  Prior to the filing of its bankruptcy petition, Buckskin owned two parcels, lot 15 ("Lot 15") and lot 16 ("Lot 16," and, together with Lot 15, the "Lots"), located within Windmont.

In August 2011, the WHA commenced a foreclosure action against Buckskin in New York State Supreme Court, Greene County (the "State Court"), seeking to foreclose on the Lots based upon liens arising from the failure to pay common charge assessments due on the Lots. The WHA moved for a default judgment against Buckskin when it failed to answer or otherwise respond to the action.  Buckskin's principal, Rey Olsen ("Mr. Olsen"), opposed the WHA's motion.  On May 31, 2012, the State Court issued an order granting the WHA's motion for a default judgment.

On September 28, 2012, the State Court issued a judgment of foreclosure and sale in favor of the WHA against Buckskin with respect to the Lots in the amount of $56,594.21, plus interest from July 23, 2012, together with costs and disbursements of $1,794.90, plus interest from September 28, 2012 (the "Judgment of Foreclosure and Sale").  The Judgment of Foreclosure and Sale was entered on October 12, 2012.  Buckskin moved to vacate the default and the Judgment of Foreclosure and Sale, which motion was denied by the State Court on November 29, 2012.

On January 8, 2013, hours before Buckskin filed its chapter 11 bankruptcy petition, the foreclosure sale of the Lots was held, and the WHA was the successful bidder with a bid of $61,880.99.

Subsequently, Buckskin commenced this adversary proceeding against the WHA and other defendants.  All of the defendants moved to dismiss, and Buckskin opposed the motions.  By prior decisions, the Court dismissed all of Buckskin's claims except the cause of action against the WHA pursuant to § 547, concluded that the § 547 claim could not be determined as a matter of law, and determined that a trial was necessary to determine whether § 547(b)(5) was satisfied.

The first two days of the trial were held on August 20, 2025 and August 21, 2025.  Subsequently, on November 18, 2025, the WHA filed a motion alleging that Buckskin, Mr. Olsen, and/or Buckskin's counsel engaged in witness tampering, and seeking the imposition of sanctions in the form of dismissal of the proceeding or, alternatively, drawing an adverse inference against Buckskin, and/or imposing monetary sanctions (the "Sanctions Motion").  Buckskin opposed the Sanctions Motion.  The Sanctions motion remained pending as the trial proceeded.  The last two days of the trial were held on December 2, 2025 and January 12, 2026, after which the parties filed post-trial memoranda.[2]

---

[2] In its post-trial memorandum of law, Buckskin reserved its rights to assert various other claims and arguments, including challenges to the WHA's claim, the underlying foreclosure action, and the Judgment of Foreclosure and Sale, as well as arguments that the WHA violated the automatic stay.  (Pl.'s Post-Trial Mem. of Law at 25-26, ECF No. 289.)  To the extent this Court has not previously ruled on those claims and arguments, nothing herein shall be deemed a determination of the merits of those arguments or that Buckskin has the right to assert such claims or raise such arguments.

<u>LEGAL STANDARD</u>

Section 547(b) governs the avoidance of preferential transfers, and provides, in pertinent

part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
>> (A) the case were a case under chapter 7 of [the Bankruptcy Code];
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of [the Bankruptcy Code].

11 U.S.C. § 547(b).[3]

The trustee or debtor-in-possession has the burden of proving the avoidability of a

transfer under 11 U.S.C. § 547(b), which must be satisfied by a preponderance of the evidence.

11 U.S.C. § 547(g); <u>In re Flanagan</u>, 503 F.3d 171, 180 (2d Cir. 2007).

The WHA does not dispute that § 547(b)(1)-(4) are satisfied by the foreclosure sale.  The

foreclosure sale was a "transfer of an interest of the debtor in property."  <u>See</u> 11 U.S.C. §

101(54).  The transfer resulted in a benefit to the WHA and was predicated on the Judgment of

Foreclosure and Sale against Buckskin on account of the antecedent secured debt Buckskin owed

to the WHA.  The sale occurred hours before Buckskin's bankruptcy petition was filed—well

---

[3] This section was amended effective February 19, 2020 to authorize a trustee or debtor in possession to commence an action under § 547(b) "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable defenses under subsection (c)." 11 U.S.C. § 547(b).

within the 90-day period—and during a time in which Buckskin's insolvency is presumed pursuant to § 547(f). 11 U.S.C. § 547(f) ("[T]he debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.").  The remaining question before the Court is whether the last element of § 547(b) is satisfied—whether the WHA received more from the sale than it would receive in a hypothetical chapter 7 liquidation.

Section 547(b)(5) "requires the [plaintiff] to construct a hypothetical chapter 7 case and determine the percentage distribution that the defendant would have received on the petition date." Sama v. Mullaney (In re Wonderwork, Inc.), 611 B.R. 169, 213 (Bankr. S.D.N.Y. 2020). "The analysis should include the cost of administering the hypothetical chapter 7 case." Savage & Assocs. v. Mandl (In re Teligent, Inc.), 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008) (citing McColley v. Navaro Gem Ltd. (In re Candor Diamond Corp.), 68 B.R. 588, 595 (Bankr. S.D.N.Y. 1986)).  However, the analysis should exclude post-petition debt, such as super-priority liens, incurred in the chapter 11 case.  See Neuger v. United States (In re Tenna Corp.), 801 F.2d 819, 823 (6th Cir. 1986); Teligent, 380 B.R. at 339.  The ultimate determination of value in "a hypothetical chapter 7 liquidation is, by nature, 'inherently speculative' and 'is often replete with assumptions and judgments.'" In re Adelphia Commc'ns Corp., 361 B.R. 337, 366–67 (S.D.N.Y. 2007) (quoting In re Affiliated Foods, Inc., 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) and In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 297–98 (Bankr. S.D.N.Y. 1990)).

<u>DISCUSSION</u>

I.    <u>Evidence Presented at Trial</u>

Buckskin asserts that, on January 8, 2013, the date of the foreclosure sale, Lot 15, consisting of 5 acres, was worth $117,500, and that Lot 16, consisting of 5.1 acres, was worth $120,000, significantly more than the WHA's winning bid of $61,880.99 and, therefore, the WHA received more than it would have in a chapter 7.  In support of its valuation, Buckskin introduced the expert testimony of appraiser Jeffrey E. Robinson of Robinson Appraisal Consultants LLC, and an appraisal prepared by him, which was admitted into evidence as Plaintiff's Exhibit 1.

To appraise the Lots, Mr. Robinson inspected and walked around the Lots on November 23, 2021, and considered environmental and permitting issues, as well as the applicable Declaration of Covenants, which governs what may and may not be done in the community in order to preserve the character.  (Tr. 8/20/25 at 28-29, ECF No. 262.)  He testified that the community had a gravel road in 2013, which was paved in 2016.  (Tr. 8/20/25 at 48, ECF No. 262.)  He testified that the Lots' location in a gated community enhanced its value by 10%. (Tr. 8/20/25 at 30-32, ECF No. 262.)  He explained that the Lots have appealing features, such as being at the highest point in the township with spectacular views.  (Tr. 8/20/25 at 45-46, ECF No. 262.)  However, the Lots are partially wooded, and open land is more valuable than wooded land.  (Tr. 8/20/25 at 45, 73, ECF No. 262.)  The Lots would have to be cleared of trees to capture the views to the west and to the south.  (Tr. 8/20/25 at 46, ECF No. 262.)

Mr. Robinson used the sales comparison approach to determine the Lots' value as of January 2013.  (Tr. 8/20/25 at 24, ECF No. 262.)  To select the six comparable land sales included in the appraisal, Mr. Robinson first reviewed sales data from 2013 through his date of

inspection in 2021 for all sales of single-family subdivisions in the town of Windham, ranging in size from 3 acres to 7.5 acres with similar topography and with no municipal services.[4]  (Tr. 8/20/25 at 52-53, 56-57, 60, ECF No. 262.)  He eliminated the sales that were at the extreme ends of the data because he "[knew] of them and something else happened, or it's just not a comparable property."  (Tr. 8/20/25 at 53, ECF No. 262.)  He then determined which of the remaining sales were arm's-length, ultimately choosing the "most comparable" sales. (Tr. 8/20/25 at 54, ECF No. 262.)  He used the same six comparables to appraise Lot 15 and Lot 16. (Tr. 8/20/25 at 88, ECF No. 262.)  The second and third comparable sales were the only comparable sales of lots located in Windmont, the same gated community as the Lots, and on the same road, Buckskin Loop. (Tr. 8/20/25 at 65, ECF No. 262; Pl.'s Ex 1 at 160, 169.). The other four comparable sales were outside the gated community, resulting in an adjustment to account for their inferior locations.  (Tr. 8/20/25 at 65, ECF No. 262.)

Mr. Robinson explained that, in valuing the Lots, he made positive and negative adjustments to the comparable sales based on market trends for the years between 2013 and each comparable sale, and made adjustments for differences in location, size, topography, land quality, wetlands, and other features.  (Tr. 8/20/25 at 47, 56, 57, 61-78, ECF No. 262.)  He also computed the mean and median of the ranges between the value per acre, and ranked the comparable sales, giving more weight to comparable sales that he determined to be most comparable.  (Tr. 8/20/25 at 84-86, ECF No. 262.)  His appraisal contains tables summarizing the six comparable sales he used, the features of the sold lots and Buckskin's Lots, and the

---

[4] Mr. Robinson's appraisal valued the Lots as of January 1, 2013 (seven days before the foreclosure sale and the bankruptcy filing on January 8, 2013) and November 23, 2021 (the date of his inspection of the Lots).  For purposes of this decision, the relevant date of valuation is January 8, 2013.  Mr. Robinson's appraisal used fourteen comparable sales, but only the first six related to his valuation of the Lots as of January 1, 2013.  (Tr. 8/20/25 at 52, 87, ECF No. 262.)  As such, the Court did not review, and will not address, comparables seven through fourteen, as they relate to a valuation date that is irrelevant to this adversary proceeding.

adjustments he made to the sale prices based upon market conditions and each sold lot's positive or negative features when compared to Lot 15 and Lot 16.  (Tr. 8/20/25 at 60-61, 81, ECF No. 262; Pl.'s Ex 1 at 160, 169).[5]

The first comparable used by Mr. Robinson was a sale of 8.67 acres in July 2017 for $180,000.  (Tr. 8/20/25 at 60, ECF No. 262; Pl.'s Ex. 1 at 57-58, 160, 169.)  Mr. Robinson adjusted the price per acre from $20,761 to $18,685/acre based on market trends from 2013 to 2017 to determine the Lots' value in 2013, and then further adjusted the price per acre based on other elements, such as location, size, and topography.  (Tr. 8/20/25 at 60, 64-65, ECF No. 262.)

The second comparable used by Mr. Robinson was a sale of 5 acres in November 2015 in Windmont, the same community as the Lots, for $155,000.  (Pl.'s Ex. 1 at 65-66, 160, 169.)  The third comparable was another sale in Windmont of 5.01 acres in November 2016 for $150,000.  (Pl.'s Ex. 1 at 7-2, 73, 160, 169.)  Mr. Robinson testified that the lots sold under the second and third comparable sales were superior to Buckskin's Lots because the sold lots were much flatter than the steep slope of Buckskin's Lots, and the lot in comparable two was "not as wooded." (Tr. 8/20/25 at 73, 74, ECF No. 262.)  Those comparables also had similar views as Buckskin's Lots.  (Tr. 8/20/25 at 75, ECF No. 262.)  Additionally, he testified that, while the second and third comparable sales were located in Windmont, the lots sold in those sales are not as similar to Buckskin's Lots as the lot sold in in comparable five, which is outside Windmont.  (Tr. 8/20/25 at 85, ECF No. 262.)  With respect to the third comparable, Mr. Robinson testified that he did

---

[5] This Court notes that the summary tables included in Mr. Robinson's appraisal do not appear to include location adjustments for comparables four and five.  (Pl.'s Ex. 1 at 160, 169.)  The appraisal explains: "Sales 4 and 5 are both located on paved roads, which is superior; however, they are located outside the community and therefore, did not require any adjustment."  (Pl.'s Ex. 1 at 162.)  It appears that Mr. Robinson offset the negative adjustment to the sale prices that would be made for the comparable lots being on a paved road by an equal positive adjustment for the comparable lots being located outside of Windmont.

not speak to the current owner, Mr. Frangos, to confirm the circumstances of the sale, but spoke with the attorney involved in that sale.  (Tr. 8/20/25 at 112, ECF No. 262.)

The fourth comparable used by Mr. Robinson was a sale of 5.7 acres in November 2014, located outside of Windmont, for $100,000.  (Pl.'s Ex. 1 at 80-81, 160, 169.)  The fifth comparable was a sale of 5.5 acres in October 2014, located outside of Windmont, for $200,000.  (Pl.'s Ex. 1 at 88-89, 160, 169.)  The sixth comparable was a sale of 5.17 acres in April 2011, also located outside of Windmont, for $77,000.  (Pl.'s Ex. 1 at 96-97, 160, 169.)  Mr. Robinson testified that comparables four, five, and six had inferior views compared to Buckskin's Lots. (Tr. 8/20/25 at 75, ECF No. 262.)  He testified that comparable six, which sold for $16,00/acre, is the "outlier."  (Tr. 8/20/25 at 86, ECF No. 262.)  Mr. Robinson opined that, as of January 1 or January 8, 2013, Lot 15 was worth $117,500 and Lot 16 was worth $120,000.  (Tr. 8/20/25 at 98, ECF No. 262.)

Mr. Robinson explained that there were two other sales in Windmont used as comparable sales by the WHA's appraiser, that he chose not to use as comparable sales.  (Tr. 8/20/25 at 94-96, ECF No. 262.)  He excluded those sales because Mr. Olsen told him that those sales were outliers with extremely low sale prices, that the sellers had been Mr. Olsen's good friends, and that Mr. Olsen advised the sellers to "get rid of those properties" to avoid liability as a result of legal claims by Buckskin against the WHA.  (Tr. 8/20/25 at 94-95, ECF No. 262.)  Mr. Robinson compared those sales to "fire sale[s]" of those lots.  (Tr. 8/20/25 at 94, ECF No. 262.)  He stated that, as a further indication of the low sale prices, one of those lots sold for $27,000 in 2014, but later sold for $155,000 about 20 months later.  (Tr. 8/20/25 at 95, 108-09, ECF No. 262.)  Mr. Robinson used that subsequent sale as the second comparable in his appraisal.  (Tr. 8/20/25 at 95, 108-10, ECF No. 262.)  Mr. Robinson conceded that his information about those sales was

received solely from Mr. Olsen and that Mr. Robinson did not speak to either of the sellers, Henry Ostberg and Neal Ostberg, or the purchaser of those lots, Mr. Schlowsky. (Tr. 8/20/25 at 104-06, ECF No. 262.) Mr. Robinson further testified that the property that was sold for $27,000 was cleared before it resold in 2015, and that he had made an adjustment for the clearing that occurred prior to the 2015 sale. (Tr. 8/20/25 at 73, 110-11, 123, ECF No. 262.) He further testified that he was not aware that the engineering for the septic tank and related systems was approved between the 2014 sale and the 2015 sale, but he explained that engineering approved for one purpose may not have any value to a subsequent purchaser who may want to build a different structure. (Tr. 8/20/25 at 111, 124, ECF No. 262.)

Mr. Robinson was unaware that Windmont's entrance gate was inoperable and dismantled and was not securing the community in 2013, 2014, and 2015. (Tr. 8/20/25 at 111, ECF No. 262.) Although he stated that the inoperable or dismantled gate does not affect the value of the Lots because it is not on the Lots (Tr. 8/20/25 at 111, ECF No. 262), this is inconsistent with his prior testimony that the Lots' presence in a gated community enhances their value (Tr. 8/20/25 at 30-32, ECF No. 262). Mr. Robinson confirmed that he did not adjust the 2015 sale of comparable three for $150,000 to account for the inoperable gate. (Tr. 8/20/25 at 111, ECF No. 262.) Further, Mr. Robinson was unsure why he excluded a sale of a lot in Windmont that occurred in October 2014 for $70,000. (Tr. 8/20/25 at 104, ECF No. 262.)

The Court also heard testimony of Anargiros Zacharias Frangos, Jr., who testified that he purchased a home in Windmont in 2010, and later purchased a lot in Windmont, is a member of the WHA, served on the WHA's board of directors from 2013 to 2023, and was the president of that board from 2013 until 2021. (Tr. 8/20/25 at 137-38, 154, ECF No. 262.)

Mr. Frangos testified that, at the time of the foreclosure sale on January 8, 2013, Windmont's common areas were dilapidated. (Tr. 8/20/25 at 142, ECF No. 262.)  Specifically, the private road, which was so steep that the town would not plow it, and the post office would not deliver mail on it, was a deteriorated gravel road that was rutted and had poor drainage.  (Tr. 8/20/25 at 142, ECF No. 262.)  The "common landscaped areas were overrun with Japanese knotweed, which at times made the road difficult to pass in the summertime," and that a four-wheel drive vehicle was needed to access the upper roads during the winter.  (Tr. 8/20/25 at 143, ECF No. 262.)

Additionally, Mr. Frangos testified that, at the time of the January 8, 2013 foreclosure of the lots, Windmont had a "toll booth type gate," but the arm that was supposed to be able to be raised and lowered was nonfunctional or constantly breaking.  (Tr. 8/20/25 at 142-43, ECF No. 262.)  There was no fencing, rendering the gated community ungated and accessible at all times. (Tr. 8/20/25 at 143, ECF No. 262.).

Mr. Frangos further testified that extensive changes were made to the common areas of Windmont after the January 8, 2013 foreclosure sale of Buckskin's Lots.  (Tr. 8/20/25 at 149, ECF No. 262.)  In 2015, the WHA spent almost $300,000 to redo the road, including stabilizing, rebuilding, and repaving it, installing drainage grates, re-digging and repairing the drainage on the sides of the road, and placing boulders and rocks as emergency guardrails.  (Tr. 8/20/25 at 151-52, ECF No. 262.)  Mr. Frangos further testified that, when he purchased the undeveloped lot in November 2016 for $150,000, which is the third sale comparable used by Mr. Robinson, the road had already been completely redone, while in 2014, the area and road in front of that lot had been impassable in the winter with a two-wheel drive.  (Tr. 8/20/25 at 138, 154, 156, ECF No. 262.)

Additionally, Mr. Frangos testified that, in 2018, the gatehouse was demolished and an entrance pavilion–depicted on the cover of Buckskin's appraisal–with stone planters and an impassible gate, was built and fencing was installed.  (Tr. 8/20/25 at 152-53, ECF No. 262.) Lighting and a security camera were installed, along with an internet connection so that the security cameras could be monitored remotely.  (Tr. 8/20/25 at 153, ECF No. 262.).  A large number of dead trees were removed, as well as the Japanese knotweed.  (Tr. 8/20/25 at 152-153, ECF No. 262.)  Mr. Frangos testified that Windmont did not have any of these improvements in 2013 or 2014.  (Tr. 8/20/25 at 153, ECF No. 262.)

With the exception of one sale, there were no sales of lots in Windmont between 2003 and the foreclosure sale of Buckskin's Lots in 2013.[6]  (Tr. 8/20/25 at 157, ECF No. 262.) Subsequently, there were three sales in 2014.  (Tr. 8/20/25 at 157-58, ECF No. 262.)  One lot was sold by Jennifer Brady to Jim Miltenberger for $70,000, and Henry and Neal Ostberg sold their respective lots to George Schlowsky.  (Tr. 8/20/25 at 159-61, ECF No. 262.)  At the time of Ms. Brady's sale to Mr. Miltenberger, the road in front of that lot was impassable during the winter without a four-wheel drive, and the gate to the community was intermittently functional and consistently broken.  (Tr. 8/20/25 at 161-62, ECF No. 262.)  Mr. Frangos testified that there was no relationship between Ms. Brady and Mr. Miltenberger, and that Mr. Miltenberger was a developer who approached Ms. Brady in an arm's-length transaction.  (Tr. 8/20/25 at 164, ECF No. 262.)

Mr. Frangos testified that the road by the Ostbergs' lots was less steep and more passable, but still difficult during winter, and there was a "very dangerous curve" just before one of those

---

[6] Mr. Frangos could not recall the exact date of the sale that took place between 2003 and the foreclosure sale (Tr. 8/20/25 at 157-58, ECF No. 262), and neither Buckskin's appraiser nor the WHA's appraiser testified that a sale of a lot in Windmont occurred during that period or relied upon such sale as a comparable.

lots. (Tr. 8/20/25 at 163, ECF No. 262.) He testified that the Ostbergs, who were previously shareholders of Buckskin, approached him and two other individuals inquiring if they wanted to make an offer on the lots. (Tr. 8/20/25 at 165, ECF No. 262.) Mr. Frangos and the other individuals, interested in purchasing the lots as a partnership, made an offer to purchase the lots from the Ostbergs, but Mr. Schlowsky bought the Ostbergs' lots first. (Tr. 8/20/25 at 165, ECF No. 262.) Mr. Frangos testified that, after Mr. Schlowsky purchased the Ostbergs' lots, Mr. Schlowsky prepared one of the lots for development before he resold it in 2015 to the Fernandos. (Tr. 8/20/25 at 168, 170, ECF No. 262.) In connection with Mr. Schlowsky's preparation of the lot for development, Windmont's Architectural Committee (1) tagged which trees could and couldn't be taken down; (2) was involved in the placement of the road that would access the common road; (3) ensured that the appropriate septic permit was obtained for the property that was going to be built; and (4) approved the plans to build the house. (Tr. 8/20/25 at 168-70, ECF No. 262.) He testified that Mr. Schlowsky built the house for the Fernandos and, therefore, when the Fernandos purchased the lot in 2015, it was not simply a purchase of land – it was vacant improved land with a septic permit, engineering plans, house plans, and architectural approval, none of which were present or existed on January 8, 2013 or when the lot was previously sold to Mr. Schlowsky in 2014. (Tr. 8/20/25 at 170-71, ECF No. 262.)

The WHA also introduced the testimony of Neal Ostberg ("Neal"), who testified that his father, Henry Ostberg ("Henry"), co-owned Buckskin with Mr. Olsen from approximately 1998 to 2004, and that Neal was involved in the business. (Tr. 12/2/25 at 140-41, ECF No. 284.) In 2004, Buckskin owned four lots, and, when Henry relinquished his ownership interest in Buckskin, an agreement was reached between Neal, Henry, and Mr. Olsen to equitably divide Buckskin's assets, wherein Buckskin conveyed Lot 1 to Neal and Lot 24 to Henry. (Tr. 12/2/25

at 142-43, 145-146, ECF No. 284.)  Lot 15 and Lot 16 remained with Buckskin, and Mr. Olsen

obtained full ownership of Buckskin.  (Tr. 12/2/25 at 142, 145-46, ECF No. 284.)

Neal testified that he and Henry retained a broker in 2013 and sold their respective lots in

2014 because it "became abundantly clear that neither of [them] wanted to build and use those

properties for personal use" and they did not want to continue to pay the HOA dues, property

taxes, and the cost to renew the approval of their septic system applications.  (Tr. 12/2/25 at 146-

151, ECF No. 284.)  Neal "believe[d]" that he sold Lot 1 for $40,000 and Henry sold Lot 24 for

$27,000 to a third party, Mr. Schlowsky.[7]  (Tr. 12/2/25 at 151, ECF No. 284.)  He and Henry

accepted those offers because they agreed that they were appropriate offers, paid the broker's

commission, and neither he nor Henry were under any type of financial distress or any duress

when the lots were sold.  (Tr. 12/2/25 at 151-53, ECF No. 284.)  Neal testified that his and

Henry's decision to sell lots 1 and 24 was not affected by anything Mr. Olsen said or did, and

that neither he nor Henry were concerned about any litigation or liability relating to Buckskin.

(Tr. 12/2/25 at 152-53, ECF No. 284.)  According to his testimony, at the time they sold their

lots, neither Neal nor Henry was aware that the WHA was going to impose an additional

assessment in 2014 and they were unaware of any action to improve the road "other than the

normal, regular resurfacing and plowing."  (Tr. 12/2/25 at 164, ECF No. 284.)

The WHA asserts that, in 2013, Lot 15 was worth no more than $33,000, and that Lot 16

was worth no more than $40,000.  In support, the WHA introduced the expert testimony of

appraiser James SanEmeterio of Hudson River Appraisal Group and an appraisal for each lot

prepared by him, which were introduced as Defendant's Exhibits F and G.[8]  Mr. SanEmeterio

---

[7] The WHA's Exhibits F and G reflect that the sale price of Lot 1 was $42,000, not $40,000.  (Def's Ex. F at 4;
Def.'s Ex. G at 4.)
[8] Exhibit F relates to Lot 15 and Exhibit G relates to Lot 16.

explained that he used a sales comparison approach to appraise the Lots, using sales within the Windmont community, as well as sales outside the community.  (Tr. 8/21/25 at 56, ECF No. 263.)  The comparables used consisted of sales of vacant land lots designated for single dwellings.  (Tr. 8/21/25 at 56-57, ECF No. 263.)  He explained that, in selecting comparables, he first looked for sales of lots that were on the same street, closest to the Lots, and, if nothing sold, then he would expand the search until he found "reasonable sales."  (Tr. 8/21/25 at 57, ECF No. 263.)  He also considered the timing of the sale, testifying that the sales that occurred closer to January 8, 2013 "would be most representative of the market at that point in time."  (Tr. 8/21/25 at 57, ECF No. 263.)

Mr. SanEmeterio testified that there are different market trends for different property types–land, commercial, residential, and industrial.  (Tr. 8/21/25 at 70, ECF No. 263.)  He used several realtor sources, such as the multiple listing service and speaking to realtors in the area, and his market trend sources focused on vacant land.  (Tr. 8/21/25 at 69-71, ECF No. 263.)  He testified that he calculated a one percent increase in the market per month between the foreclosure date of January 8, 2013 and each comparable's sale date.  (Tr. 8/21/25 at 67, ECF No. 263.)  Mr. SanEmeterio explained that the presence of many sales in a neighborhood reflects interest in the neighborhood and that the lack of sales for years indicates no interest in the neighborhood.  (Tr. 8/21/25 at 84, ECF No. 263.)  He testified that there were no sales in Windmont in the 4 years prior to January 8, 2013, and that the market in Windmont was "relatively dead."  (Tr. 8/21/25 at 84-85, ECF No. 263.)

Mr. SanEmeterio explained that market research and experience indicate that sloped properties, or properties with developmental difficulties, generally sell at lower prices than properties that are relatively flat and that can be developed more easily, due to the cost of

development.  (Tr. 12/2/25 at 54, ECF No. 284.)  In conducting his evaluation of the Lots, Mr.

SanEmeterio learned that Lot 15 could not support a conventional septic system, and it would

likely incur greater costs to develop the property. (Tr. 8/21/25 at 107-11, ECF No. 263.)

Mr. SanEmeterio used the same sales comparables for Lot 15 and Lot 16.  (Tr. 8/21/25 at

58-59, ECF No. 263.)  He applied adjustments to each sale based upon the differences between

the sold lot of the respective comparable and the lot being valued.  (Tr. 8/21/25 at 59, ECF No.

263.)  Prior to using the comparables, Mr. SanEmeterio verified that the sales were arm's-length

transactions with no extenuating circumstances, but he could not recall the exact way he verified

them.  (Tr. 8/21/25 at 75-76, ECF No. 263; Tr. 12/2/25 at 81, 131-32, ECF No. 284.)  He

testified that he inspected the comparables from the street.  (Tr. 12/2/25 at 50, ECF No. 284.)  He

did not find comparables outside of the Lots' community that sloped to the same degree as the

Lots.  (Tr. 12/2/25 at 105, ECF No. 284.)

Mr. SanEmeterio testified that the first comparable sold for $70,000 on October 24, 2014,

and is located in Windmont, on Buckskin Loop–the same road as the Lots–"almost across the

street" from the Lots, is the same size as the Lots, and has the same features as the Lots.  (Tr.

8/21/25 at 60, 65, ECF No. 263; Def.'s Ex. F at 4; Def.'s Ex. G at 4.)  He testified that the first

comparable had superior potential views than the Lots, and that the comparable and Lot 15

needed clearing to see full view.  (Tr. 8/21/25 at 65-66, ECF No. 263.)  He also testified that the

first comparable had superior topography than Lot 15 because it was less sloped. (Tr. 8/21/25 at

66, ECF No. 263.)  As a result, Mr. SanEmeterio adjusted that comparable's sale price

downward to account for the difference in topography and potential views as compared to Lot

15.  (Tr. 8/21/25 at 66, ECF No. 263.)  He also applied a 22% downward adjustment because 22

months elapsed from January 8, 2013 to the sale date, based upon a 1% market appreciation per month.  (Tr. 8/21/25 at 67-68, ECF No. 263.)

The second comparable used by Mr. SanEmeterio is on Buckskin Loop in Windmont, is comprised of 5.06 acres, and sold for $42,000 on March 7, 2014. (Def.'s Ex. F at 4; Def.'s Ex. G at 4.)  He testified that the second sale comparable is a similar sized lot within the community, and that he made adjustments to reflect it was superior to Lot 15 because it was less sloped, but inferior because Lot 15 had better views.  (Tr. 8/21/25 at 73, ECF No. 263.)  He also made the market trend downward adjustment.  (Tr. 8/21/25 at 73, ECF No. 263.)

The third comparable used by Mr. SanEmeterio is on Buckskin Loop in Windmont, comprised of 5 acres, sold for $27,000 on March 7, 2014, and was purchased by the same buyer as the second comparable.  (Tr. 8/21/25 at 83-85, ECF No. 263; Def.'s Ex. F at 4; Def.'s Ex. G at 4.)  This lot also was not as sloped as Lot 15 but, because the lot was at the bottom of the hill, the views were very limited compared to Lot 15. (Tr. 8/21/25 at 86, ECF No. 263.)  As with the prior comparables, there was nothing of record to indicate that this was not an arm's-length sale.  (Tr. 8/21/25 at 86, ECF No. 263.)  He indicated that Mr. Robinson used a later, higher priced transaction for the third comparable by using its November 2015 sale for $155,000.  (Tr. 8/21/25 at 87, ECF No. 263.)  However, Mr. SanEmeterio did not include the November 2015 sale as a comparable, because prior to that sale, the property had been "materially improved" by the paving of the road, the engineering for a septic system, the cutting of trees, and development of a home site.  (Tr. 8/21/25 at 88-93, ECF No. 263.)  As such, it was "no longer apples to apples." (Tr. 8/21/25 at 88, ECF No. 263.)

Mr. SanEmeterio testified that Lot 16 was lower than Lot 15, and more buildable.  (Tr. 8/21/25 at 96, ECF No. 263.)  He testified that "[t]he topography for [Lot] 15 is significantly and

severely sloping throughout most of it and development would be far greater in difficulty to develop on [Lot] 15 versus [Lot] 16." (Tr. 8/21/25 at 96, ECF No. 263.) Lot 16's topography was similar to the first, second, and third comparables and, therefore, no downward adjustment was made for topography, thereby increasing Lot 16's value as compared to Lot 15. (Tr. 8/21/25 at 97, ECF No. 263.) The other adjustments that were made to the first three comparables with respect to Lot 15 were also made for Lot 16. (Tr. 8/21/25 at 97, ECF No. 263.) As a result, Mr. SanEmeterio placed a higher value of $40,000 on Lot 16 and valued Lot 15 at $33,000. (Tr. 8/21/25 at 97, ECF No. 263.)

The fourth, fifth, and sixth comparables used by Mr. SanEmeterio were located in "competing developments in the Windham community." (Tr. 8/21/25 at 101, ECF No. 263.) The fourth comparable sold for $60,000 on February 23, 2012, and was comprised of 6.9 acres, and was 2.75 miles from Lot 15 and 2.74 miles from Lot 16. (Def.'s Ex. F at 5; Def.'s Ex G. at 5). He testified that they were not located in gated communities, but explained that, on January 8, 2013, Windmont only had a structure at the bottom of the hill and "[t]o call it a gated community at that point would be a stretch." (Tr. 12/2/25 at 114-15, ECF No. 284.) He testified that comparable four, which sold for $60,000, was "far more level, suitable for development" as compared to Lot 15, and the views were better than the views of Lot 15 and Lot 16. (Tr. 8/21/25 at 102, ECF No. 263.)

The fifth comparable sold for $55,000 on June 21, 2012, and was comprised of 5.1 acres, and was 2.02 miles from Lot 15 and 2 miles from Lot 16. (Def.'s Ex. F at 5; Def.'s Ex G at 5.) Mr. SanEmeterio testified that he used the same process to compare comparable five to the Lots, which had better topography than Lot 15 and similar views and view potential as Lot 15 and Lot 16. (Tr. 8/21/25 at 103, ECF No. 263.)

The sixth comparable sold for $75,000 on February 12, 2013, was comprised of 5.2 acres, and was 2.77 miles from Lot 15 and 2.76 miles from Lot 16. (Def.'s Ex. F at 5; Def.'s Ex G at 5.) Mr. SanEmeterio testified that he did not adjust the sixth comparable to account for market trends because it sold shortly after the foreclosure sale of the Lots, and he acknowledged that he could have made a 1% adjustment for the 20 or 30 days that elapsed since January 8, 2013. (Tr. 8/21/25 at 103, ECF No. 263.) The adjustments for topography and views were made, resulting in an adjusted sale price of $33,750 when compared to Lot 15. (Tr. 8/21/25 at 103, ECF No. 263.) Mr. SanEmeterio testified that he made similar adjustments when comparing the lots sold in comparables four, five, and six to Lot 16, except that a less negative adjustment was made because Lot 16 is not as severely sloped as Lot 15. (Tr. 8/21/25 at 104, ECF No. 263.)

Mr. SanEmeterio testified that he gave more weight to the first three comparables when determining the Lots' values because those sales were within the same development as the Lots, on the same road as the Lots, in close proximity to the Lots, and the sales were within the relevant time period. (Tr. 8/21/25 at 105-06, ECF No. 263; Tr. 12/2/25 at 132, ECF No. 284.)

Mr. SanEmeterio opined that a lot's inclusion in a gated community was not necessarily a positive quality and is subjective to the potential buyer. (Tr. 12/2/25 at 116, ECF No. 284.) A buyer may want to be in a gated community and be entitled to the "accoutrements that go along with it," but a buyer also may not want to be in a gated community because of the associated fees. (Tr. 12/2/25 at 116, ECF No. 284.) Based upon the comparables he used, Mr. SanEmeterio testified that the assumption can be made that not being in a gated community results in higher values, as reflected by the comparables outside of Windmont, compared to the sales inside Windmont. (Tr. 12/2/25 at 116, ECF No. 284.) However, he also acknowledged that it was a stretch to call Windmont a gated community at the time of the foreclosure sale of the Lots. (Tr.

12/2/25 at 115, ECF No. 284.)  He further testified that restrictions by a homeowner's association, such as the Declaration of Covenants in Windmont, do not necessarily affect value when compared to properties without restrictions.  (Tr. 12/2/25 at 123-124, ECF No. 284.)

Mr. Olsen testified, as a rebuttal witness, that the gatehouse to the community and the security gate were improved in December 2012 or January 2013 by the construction of another gatehouse and installation of a remote-operated electronic security gate.  (Tr. 1/12/26 at 84, 86, 96-97.)  He then clarified that the gatehouse was not new in 2013, but that the preexisting gatehouse was "spruced up" by replacing boards, painting, cleaning windows, and replacing the lock. (Tr. 1/12/26 at 88-91, ECF No. 281.)  He testified that the security gate's sticks were replaced, the mechanism for lifting the gate and the keypad to enter the code were repaired and upgraded, and the shrubbery and landscaping around the gatehouse was improved.  (Tr. 1/12/26 at 88-91, 93, ECF No. 281.)  Mr. Olsen testified that the work was performed by a contractor hired by the board of directors because the conditions had deteriorated and needed upgrading. (Tr. 1/12/26 at 92, ECF No. 281.)

However, in surrebuttal of Mr. Olsen's testimony, Mr. Frangos testified that there were no improvements to the gatehouse or the mechanical operation in 2012 or 2013 and that the condition of the gatehouse in November 2013 was the same as when he purchased his property in 2010.  (Tr. 1/12/26 at 100, 104, ECF No. 281.)  The gate was improved in 2009 but then destroyed and remained nonfunctional in 2010 through 2013.  (Tr. 1/12/26 at 105, 107, ECF No. 281.)  The gatehouse was then demolished in 2018 and replaced in 2019.  (Tr. 1/12/26 at 110, ECF No. 281.)

II.    <u>Findings and Analysis</u>

This Court must determine whether Buckskin has met its burden of proof under § 547(g) to establish, by a preponderance of the evidence, that the WHA received more than it would have in a chapter 7 case.  As reflected in the testimony and the appraisals, while Buckskin and the WHA both rely on the sales comparison method, they differ significantly as to the value of the Lots as of January 8, 2013.

A bankruptcy court is often tasked with determining an asset's value for various purposes under the Bankruptcy Code including, among other things, avoidance actions under §§ 544, 547 and 548, lien avoidance under § 522(f), lien stripping under § 506, and determining whether a plan satisfies the "best interest of creditors" test under § 1129.  "Where there is a significant difference in value between a debtor's appraisal of a property and the secured creditor's appraisal of a property, the accuracy of the debtor's appraisal is called into question."  <u>In re Gucciardo</u>, 576 B.R. 297, 300 (Bankr. E.D.N.Y. 2017) (quoting <u>In re Pod</u>, 560 B.R. 77, 82 (Bankr. E.D.N.Y. Oct. 25, 2016)).

"Courts have consistently held that valuation is 'not an exact science.'"  <u>In re Levin</u>, No. 8-17-77330-LAS, 2020 WL 1987783, at *3 (Bankr. E.D.N.Y. Apr. 24, 2020) (quoting <u>Karakas v. Bank of N.Y. (In re Karakas)</u>, Bankr. No. 06-32961, Adv. No. 06-80245, 2007 WL 1307906, at *5 (Bankr. N.D.N.Y. May 3, 2007)).  "Any judicial determination of fair market value of real estate is, at most, a fixing of a hypothetical price 'at which [the real estate] would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.'"  <u>Levin</u>, 2020 WL 1987783, at *3 (quoting <u>Ellis v. U.S. Bank. Nat'l Ass'n (In re Ellis)</u>, Case No.: 16-30870 (AMN), 2017 WL 3822018, at *4 (Bankr. D. Conn. Aug. 28, 2017)) (alteration in original).  Notably, "[a] court is

not bound by the values determined by appraisals but rather may form its own opinion as to the value of the subject property after the consideration of the appraisers' testimony and their appraisals." Wright v. Chase (In re Wright), 460 B.R. 581, 584 (Bankr. E.D.N.Y. 2011) (quoting In re Patterson, 375 B.R. 135, 144 (Bankr. E.D. Pa. 2007) (quoting Karakas, 2007 WL 1307906, at *6-7)). See also Pod, 560 B.R. at 80.

The proper method to value undeveloped land is the comparable sales method. See In re Melgar Enters., Inc., 151 B.R. 34, 42 (Bankr. E.D.N.Y. 1993). "In analyzing comparable sales relied upon in appraisals, courts give more weight to sales that took place no more than 6 months prepetition and 3 months post-petition." Levin, 2020 WL 1987783, at *3 (citing cases). "In addition to the timing of comparable sales, courts also consider other factors such as location, lot size, square footage, condition, and age of the property." Id. (citing Toal v. Chase Home Fin. LLC (In re Toal), Bankr. No. 10-72783-478, Adv. No. 10-8613-478, 2011 WL 3607911, at *3 (Bankr. E.D.N.Y. Aug. 15, 2011)). "The greater the distance the comparable sales are from the subject property, the less indicative they are as to the value because 'a property located two to three miles away may have different access to amenities or facilities, and different neighborhood characteristics.'" Id. (quoting Ellis, 2017 WL 3822018, at *5). "The preferred location for comparable properties is the immediate neighborhood or subdivision where the subject is located." Id. at *4 (quoting Toal, 2011 WL 3607911, at *4).

"When two appraisals conflict, a court should carefully compare 'the logic of their analyses' and 'the persuasiveness of their subjective reasoning.'" Id. (quoting In re Hassan, No. 14-73711-reg, 2015 WL 5895481, at *5 (Bankr. E.D.N.Y. Oct. 8, 2015)). "What matters is not the mere existence of widely varying appraisals, but rather the *reasons* for those variations." Id. (quoting In re Bate Land & Timber, LLC, 523 B.R. 483, 499 (Bankr. E.D.N.C. 2015)).

Based upon the evidence presented, the Court does not find that Buckskin's evidence is persuasive as to the value of the Lots. While both appraisers used the comparable sales approach, the first, fourth, fifth, and sixth comparables relied on by Buckskin's appraiser, Mr. Robinson, involved lots located outside of Windmont. Noticeably absent from Mr. Robinson's appraisal is the distance of each comparable to the Lots. Although all of Mr. Robinson's comparables are located in Windham, his appraisal recites that Windham "encompasses 45.34 square miles." (Pl.'s Ex. 1 at 17.) The absence of any evidence of the distance between the lots of the comparable sales to Buckskin's Lots severely impedes this Court's ability to fully determine whether a sold lot is, indeed, comparable to the Lots. While Mr. Robinson opined that the fifth comparable sale is the most comparable to the Lots, which, at $200,000, was the highest sale price of all the comparables (See Tr. 8/20/25 at 84-85, ECF No. 262; Pls. Ex. 1 at 88-89, 160, 169), this Court cannot give much weight to that opinion without knowing the distance between the fifth comparable and the Lots.

Additionally, this Court finds that Mr. Frangos credibly testified that the common areas and features of Windmont underwent a significant upgrade after the foreclosure sale of the Lots. The road was completely redone, the gate was fixed, a new entrance pavilion was constructed, a security camera was installed, and landscaping was improved by the removal of dead trees and Japanese knotweed. Giving credit to Mr. Olsen's testimony that the gatehouse had been "spruced up" and the gate was fixed, this Court finds, based on Mr. Frangos's testimony, that the gate was quickly rebroken and left unrepaired.

The valuation given by Mr. Robinson to the Lots gave the Lots the benefit of the extensive improvements, even though they had not yet been undertaken. Additionally, this Court finds the testimony of Mr. Frangos credible that the second sale relied upon by Mr. Robinson

related to a lot in Windmont that had been significantly improved and prepared for development prior to the November 2015 sale for $155,000, rendering such sale barely comparable to the Lots. Similarly, the third comparable, which is a lot purchased by Mr. Frangos in Windmont for $150,000, had the benefit of the improved road, which did not exist at the time of the foreclosure sale of the Lots.

Moreover, and more troubling, Mr. Robinson's appraisal excluded three sales of lots located within Windmont that occurred closest in time to the foreclosure sale. Specifically, Mr. Robinson excluded the sale from Ms. Brady to Mr. Miltenberger in 2014 for $70,000, but Mr. Robinson could not explain why it was excluded. He also excluded the sales by the Ostbergs in 2014 to Mr. Schlowsky for $42,000 and $27,000 after determining that they were not arm's-length sales based upon representations made by Mr. Olsen, Buckskin's current sole shareholder. However, Neal Ostberg's credible testimony refutes any assertion that the sales were anything other than ordinary, arm's-length sales. Instead, Mr. Robinson used three comparables that are outside a reasonable period of time from the foreclosure sale of the Lots: (1) the first comparable sale occurred in July 2017, more than three years after the foreclosure sale of the Lots; (2) the second comparable sale occurred in November 2015; and (3) the third comparable sale occurred in November 2016.

In its post-trial memorandum of law, Buckskin argues that Neal Ostberg's testimony reflects that the Ostbergs' lots were listed in February 2014 and sold in March 2014 and therefore argues that "[a]n elapsed time of a month to close a sale at low prices can be construed as being in a hurry to divest, which is not an arms-length transaction." (Pl.'s Post-Trial Mem. of Law at 21, ECF No. 289.) Buckskin further argues that the Ostbergs sold their lots after receiving notice of a future assessment on members of the WHA to fund the roadwork. (Pl.'s

Post-Trial Mem. of Law at 21-22, ECF No. 289.)  However, the short window between listing

lots of undeveloped land for sale and closing on those sales, or the existence of a future

assessment, does not lead to the conclusion that the sales of the Ostbergs' lots were not arm's-

length transactions, particularly when Neal Ostberg credibly testified as to the reasons for the

sales and that he and Henry were unaware of a future assessment.

While Mr. Robinson used various adjustments based on market trends to account for the

lapse in time between the six comparables he utilized and the January 8, 2013 foreclosure sale of

the Lots, this Court finds that sales by Ms. Brady, Neal Ostberg, and Henry Ostberg are more

appropriate sale comparables than the ones used by Mr. Robinson.  Furthermore, rather than

using sales that occurred years from the foreclosure sale, of lots that are undisclosed distances

from the Lots, and adjusting the sales upwards and downwards to reach a valuation of the Lots as

of January 8, 2013, the more appropriate and persuasive comparables are the arm's-length sales

that occurred closest in time to the relevant date, in close proximity to the Lots, and similar in

features, and then adjusted accordingly to account for any market trends and differences in

features such as views, topography, etc.  In other words, it is more appropriate to use

comparables that need to be adjusted as little as possible.  Indeed, Mr. Robinson testified that

"the less adjustment needed to any comparable means it's more comparable." (Tr. 8/20/25 at 54,

ECF No. 262.)  However, Mr. Robinson excluded Ms. Brady's sale from his appraisal for an

unknown reason and excluded the Ostbergs' sales based on unsupported assertions by Mr. Olsen,

a key party-in-interest.

In its post-trial memorandum of law, Buckskin attacks the credibility of the WHA's

appraiser and the WHA's appraisals on various grounds, including: (1) pages 3 and 4 of the

WHA's appraisals "are for bank appraisals for mortgage purposes" and is inappropriate for

purposes of this adversary proceeding; (2) the WHA violated Rule 26(a)(2)(vi) and (e) of the

Federal Rules of Civil Procedure by not filing a disclosure of how much Mr. SanEmeterio was

paid;[9] (3) the WHA's appraisal violated the Uniform Standard of Professional Appraisal Practice

("USPAP") by failing to disclose the intended use of the appraisal.  (Pl.'s Post-trial Mem. of Law

at 8, ECF No. 289.)

These arguments are rejected.  There is no evidence that Mr. SanEmeterio used incorrect

forms or failed to comply with USPAP.  Indeed, Mr. SanEmeterio testified that the format of his

appraisal was the format used for valuing lots like Buckskin's Lots, and that USPAP does not

dictate how a report should be formatted.  (Tr. 8/21/25 at 14-15, ECF No. 263.)

Additionally, "there is no authority 'for the proposition that an appraiser's compliance

with USPAP is the sole determining factor as to whether an appraiser's valuation report is

reliable.'"  In re Creekside Sr. Apartments, LP, 477 B.R. 40, 65 (B.A.P. 6th Cir. 2012) (quoting

Whitehouse Hotel Ltd. P'ship v. Comm'r, 615 F.3d 321, 332 (5th Cir.2010)).  "This is especially

true when the trial court is the 'factfinder as well as the expert-testimony gatekeeper . . . .'"  Id.

(quoting Whitehouse Hotel, 615 F.3d at 332).  Nonetheless, no evidence was produced at trial to

support Buckskin's argument that Mr. SanEmeterio's appraisal did not comply with USPAP.

Moreover, this Court does not find that Mr. SanEmeterio's appraisal is lacking or deficient.  On

the contrary, Mr. Robinson's appraisal and testimony appeared to be overly cumbersome and

overcomplicated in an attempt to apply higher comparable sales to the Lots to increase their

value and was deficient for the reasons already discussed.

Buckskin further challenges other aspects of Mr. SanEmeterio's appraisal, such as

arguing that an average single-family residence is 2,100 square feet and that Mr. SanEmeterio

---

[9] Notably, Buckskin did not make any pretrial discovery motion to compel disclosure.

"evaluated Lots 15, 16 and the comparables as if they were intended for a multi-home subdivision or agricultural exploitation by considering the topography and woodedness of the 90% of the 5-acres that would never be utilized and left in its natural state."  (Pl.'s Post-Trial Mem. of Law at 9, ECF No. 289.)  It appears that Buckskin is arguing that Mr. SanEmeterio should not have made adjustments to the comparables based upon the Lots' "woodedness," because the Lots would only need to be cleared enough to build an average single-family residence.  No evidence as to the average size of a single-family residence was produced at trial and, in any event, this Court disagrees with Buckskin's characterization of Mr. SanEmeterio's evaluation and adjustments.  Mr. SanEmeterio testified that "[t]rees were never a valuation factor other than how much needed to be cleared [to see the] view[s]."  (Tr. 8/21/25 at 43, ECF No. 263.)  This is consistent with Mr. Robinson's testimony that the trees would need to be cleared to capture the Lots' views.  (Tr. 8/20/25 at 46, ECF No. 262.)

Buckskin also argues that Mr. SanEmeterio's appraisals, which recite that the market was "stable" is inconsistent with his 1% monthly appreciation adjustment.[10]  This Court finds no inconsistency between those two statements.  Mr. SanEmeterio concluded that the market trend reflected a monthly appreciation of 1% during the relevant time period.  In this Court's view, a steady, consistent monthly increase of 1% is "stable."

Buckskin raises other alleged deficiencies with respect to Mr. SanEmeterio's appraisal, including issues with comparables used, adjustments made, and other alleged USPAP

---

[10] Mr. SanEmeterio's appraisals described the market as "relatively stable."  (Def.'s Exs. F at 3; Def.'s Ex. G at 3.)

violations.[11]  However, Buckskin provided no evidence at trial to support any conclusion that the comparables or adjustments used by Mr. SanEmeterio were improper and, instead, raises a laundry list of challenges to his appraisal in its post-trial memorandum of law.  This Court cannot begin to address each alleged deficiency.  Suffice it to say, the challenges and alleged deficiencies rely on evidence that was not introduced at trial, rely on speculation, are based on blatantly incorrect conclusions, or are otherwise unpersuasive.[12]

More importantly, Buckskin's challenges to the WHA's appraisal, and Buckskin's argument that "[w]ithout credible valuation evidence, the creditor cannot meet its burden of showing that the transfer did not enable it to receive more than it would have in a Chapter 7 liquidation," (Pl.'s Post-Trial Mem. of Law at 8, ECF No. 289), completely ignores the fact that § 547(g) places the burden of § 547(b)(5) squarely <u>on Buckskin, not the WHA</u>.  For the reasons previously discussed, Buckskin's appraisal did not convincingly establish the value of the Lots as of January 8, 2013.  Put simply, the failure to use the sales within Windmont closest in time to the foreclosure sale, the inclusion of a significantly improved lot as a comparable, and the failure to take into account Windmont's dilapidated common areas at the time of the foreclosure sale were fatal to the credibility of Mr. Robinson's appraisal of the Lots.  On the other hand,

---

[11] For example, Buckskin argues that Mr. SanEmeterio did not inspect the lots of the comparable sales he relied on in his appraisals. (Pl.'s Post-Trial Mem. of Law at 12, ECF No. 289.) However, Buckskin's counsel expressly inquired if Mr. SanEmeterio inspected the fourth, fifth, and sixth comparables, to which Mr. SanEmeterio answered "yes," and explained that he inspected them "[f]rom the street only, as you require[] permission to access properties. Otherwise[,] it's trespassing."  (Tr. 12/2/25 at 50, ECF No. 284.)  Buckskin's counsel did not question Mr. SanEmeterio as to whether he visited the other comparables. It must be noted that Mr. Robinson testified that he, too, only inspected the comparables that he used from the road, explaining that he is "only able to" inspect from the road.  (Tr. 8/20/25 at 55, ECF No. 262.)
Similarly, Buckskin argues that Mr. SanEmeterio violated USPAP because he "made an extraordinary assumption that flat lots are more valuable than sloped lots." (Pl.'s Post-Trial Mem. of Law at 15, ECF No. 289.) However, Mr. Robinson also testified that flatter lots are superior to sloped lots.  (Tr. 8/20/25 at 74, ECF No. 262.)
[12] For example, Buckskin asserts that the first comparable used by Mr. SanEmeterio, which sold for $70,000 in 2014, subsequently sold for $205,000 in 2017, and that the second comparable used by Mr. SanEmeterio, which sold for $42,000 in 2014, subsequently sold for $1,247,500 in 2016.  (Pl.'s Post-Trial Mem. of Law at 22, ECF No. 289.) However, no evidence was provided at trial with respect to the conditions of the lots at the time of those sales.

Buckskin has not established an evidentiary basis to undermine the comparables used by Mr. SanEmeterio or the credibility of his appraisals of the Lots, and this Court finds Mr. SanEmeterio's valuation of the Lots to be persuasive. As such, this Court concludes that, as of January 8, 2013, Lot 15 had an approximate value of $33,000, and Lot 16 had an approximate value of $40,000.

Furthermore, the analysis under Section 547(b)(5) does not begin and end with a valuation of the Lots, and the determination is not based solely on whether the WHA received property valued in excess of its secured claim. Rather, Buckskin bears the burden to show, by a preponderance of the evidence, that the WHA received more than it would have in a chapter 7 case. That showing requires additional evidence of what the costs of administration would have been, whether the trustee would have pursued the sale, and what distribution would have been made to the WHA. However, Buckskin has not provided any evidence with respect to this step of the analysis.

This Court concludes that a trustee would not have pursued a sale of the Lots, and the WHA would have been permitted to foreclose. The Lots' combined value as of January 8, 2013 was approximately $73,000. The WHA's bid for the Lots was $61,880.99, which Buckskin acknowledges was the amount of the WHA's claim as of January 8, 2013. (Pl.'s Post-Trial Mem. of Law at 1, ECF No. 289.) This Court cannot find that the WHA received more than it would have in a hypothetical chapter 7 case for purposes of § 547(b)(5). This is because the Court must consider the costs of administering the hypothetical chapter 7 case. Additionally, if the Lots were worth more than the WHA's lien, then the WHA would have been entitled to interest and attorneys' fees under § 506, which would continue to accrue while a chapter 7 trustee marketed the Lots.

"Although not binding on this Court, chapter 7 trustees are guided in the discharge of their statutory and fiduciary duties by a handbook authored by The Office of the United States Trustees." In re Stark, No. 8-20-70948-reg, 2020 WL 5778400, at *6 (Bankr. E.D.N.Y. Sept. 25, 2020) (citation omitted).  The handbook provides that "[a] trustee may sell assets only if the sale will result in a meaningful distribution to creditors," and that "[i]f the sale will not result in a meaningful distribution to creditors, the trustee must abandon the asset." Id. (quoting Trustee Handbook at 4-14).  "Generally, a trustee should not sell property subject to a security interest unless the sale generates funds for the benefit[] of unsecured creditors." Id. (quoting Trustee Handbook at 4-16). See also Rambo v. Chase Manhattan Mortg. Corp. (In re Rambo), 297 B.R. 418, 433 (Bankr. E.D. Pa. 2003) ("Indeed the Chapter 7 trustee is specifically instructed by the United States Trustee to sell only those secured assets that will generate funds for the benefit of unsecured creditors."). "Where property is of inconsequential value to the estate, abandonment under § 554, rather than sale under § 363, is the proper course." Rambo, 297 B.R. at 433 (citing In re Feinstein Fam. P'ship, 247 B.R. 502, 507 (Bankr. M.D. Fla. 2000)).  "[T]he attempted sale of secured property without the assurance of an equity cushion can be a risky proposition[,] for if the sales proceeds are inadequate to pay the costs of sale, the trustee may not be able to recover them under § 506(c) from a secured creditor who has not consented to the sale." Id. (citing In re Crutcher Concrete Constr., 218 B.R. 376, 380 (Bankr. W.D. Ky. 1998)).

In Buckskin's chapter 11 case, the only claims listed on the schedules is a claim owed to Mr. Olsen, an insider of Buckskin, for wages, salaries, and commissions for $140,700, of which $11,725 was designated priority, and an unsecured and disputed claim owed to the WHA for $58,000.[13]  (Case No. 13-40083-nhl, ECF No. 10.)  However, subsequent to the bankruptcy

---

[13] As previously determined by this Court in prior decisions, the WHA's claim against the Lots is secured.

filing, New York State Department of Taxation & Finance filed a secured claim of $315.71, the Internal Revenue Service filed an unsecured claim for $7,848.00, and Mr. Olsen filed a claim for $111,750.56 (of which $6,000 was designated priority).  In 2017, the Internal Revenue Service also filed an administrative claim for $10,000, of which $2,500 was attributable to the tax year ending 2013 and $2,500 was attributable to the tax year ending 2014.

Although the value of the Lots exceeded the WHA's claim of $61,880.99 on January 8, 2013, the existence of approximately $11,000 in equity does not lead to the conclusion that the WHA received more than it would have in a hypothetical chapter 7 case.  Rather, this Court concludes that a trustee in a hypothetical chapter 7 case would likely decline to pursue a sale of the Lots, given the costs that would be incurred.  This is so because, to the extent there was equity in the Lots, the WHA would have been entitled to continuing interest and attorneys' fees pursuant to § 506(b).  The increasing secured claim, together with the costs of administration, including broker's commissions, transfer taxes, any capital gains taxes or other taxes, the compensation of any accountant retained as a result of those tax consequences, and the trustee's statutory commissions, makes it impossible to imagine any scenario under which any equity would remain for the benefit of unsecured creditors.  See Rambo, 297 B.R. at 434-35 (concluding that the trustee would not seek to sell an asset that had over $60,000 of equity because, after considering the costs of sale and administration of the estate, there would be no benefit to creditors of the estate).

<u>CONCLUSION</u>

For the foregoing reasons, this Court concludes that Buckskin has not met its burden to avoid the foreclosure sale of the Lots under § 547(b).  Given this determination on the merits in the WHA's favor, the WHA's pending Sanctions Motion for witness tampering is deemed moot. The Court will issue an order consistent with this decision and a judgment in favor of the WHA.



Dated: February 27, 2026
      Brooklyn, New York

_Nancy Hershey Lord_
**Nancy Hershey Lord**
**United States Bankruptcy Judge**